Good morning. Judge Black and I are very happy to welcome here for her second day this week of sitting with us Judge Kathleen Williams. As some of you who follow the Eleventh Circuit may know, we are a very busy court and we depend heavily on the services of judges who are willing to come and sit with us and visit. Judge Williams serves on the Southern District of Florida's District Court since 2011. She comes with a lot of experience. Before that, for many years, she was the federal defender in Miami and as you can imagine, that's quite a busy job. She also was nationally recognized for her proficiency in that arena. I know that because I was chair of the Criminal Law Committee for the Judicial Conference for the United States. Judge Williams was selected to be the liaison for all the defenders in the United States to that committee. Judge Black and I are both longtime district judges ourselves. We particularly appreciate the insights and experience of our first-line responders, our district court judges. They bring a lot of wisdom and a lot of experience in the issues that we deal with. We welcome you, Judge Williams. We will call our first case, Hammett v. Paulding County. Thank you, Your Honors. We appreciate the chance to argue this case before the panel today. My name is Steve Griffiths and with Gary Hooper, we represent Justin Hammett, who is the administrator of the estate of Daniel Hammett. This case is here because Daniel Hammett, who was in his residence, was killed in a police shooting. He was in his residence. He did not have a firearm. There were no shots fired except the shots by the police officers and he was not a suspect of any crime. Probably the key question that was before the trial court had to do with which police officer shot first. That is what you say. Let me preface before we get into the legal arguments. Obviously, life was lost and it is very sad. Clearly, we are all very sorry about the loss of Mr. Hammett's life. I don't want that to go unsaid before we get into all the legal requirements. My understanding was that whoever fired first was not that material. The question was whether in the fast-moving events that happened, it was Officer Wittner or the other officer that fired first, was whether or not either of them, under that set of circumstances, was objectively reasonable for them to use force. You disagree that that is the issue here? I agree that that is the issue, but I think the findings of fact that the trial court made, that the court said a jury could find in favor of the plaintiff, and that contradicted the stories or the justification and claims that the defendants made, can have two diametrically different results as far as whether or not there was justification. I mean, we all know that events did move fast, but you have to go through step-by-step what each officer claimed and what the trial judge said a jury could find. Because if you read Officer Horsley's testimony, his entire defense for justification, he's the officer that the defendant claimed shot first. And the first shot hit Mr. Hammett in the left index finger. Okay. The story they say or the claim they make is that Mr. Hammett came out of the bedroom into the hall. We're not totally clear if that was the first or the second shot. Are we on the finger? We are not clear. Why is that? Why don't the ballistics, I didn't understand that part. How could the ballistics of police-issued guns, or did I read that incorrectly? Do we know which shot came from which gun? We do not because GBI did ballistics and said they could not make that distinction. And did they say why? They did not say why. Okay. It's just in the report that they could not make a determination which gun. I think they were both .45 caliber guns. And we were surprised too, but that was the report. Counsel, I have one comment and then a question. Okay. As Mrs. Van Cleve said, the shots went pop, pop. They were close together. It would help me if you make your best argument based on your view of the facts. Okay. We do not dispute that the shots were close together. Our best argument would be that Mr. Hammett had come to a stop, that he was listening and following the commands that were given to him, which was stop and show your hands. Because his hands were 52 inches above the ground. That's right. Okay. Now, if Officer Horsley, who says he shot first, he's describing almost like a hand-to-hand combat situation where Mr. Horsley's come up with him. He's got his right hand moving toward his face. He says they're face-to-face. In fact, he says when I shot . . . Counsel, I just want your best from your standpoint, your plaintiff's view of the facts, what happened. The best standpoint is Mr. Hammett stopped, showed his hands as commanded. At that point in time, our assertion is not Officer Horsley, but Officer Whitener shot first. If you look at the evidence, it would be more likely than not that she shot first. She shot first. Right. And what did she hit? She hit his index finger. So then the second shot, plaintiff's lady, there's evidence, and the court found there's evidence that a jury could find this. The second shot is from Officer Horsley. That shot is to the back of Mr. Hammett. So we say that negates . . . In your view, there was a pop finger, pop, the shot that hit him. Okay. Right. We're together so far. Okay. Go ahead. In simplest terms, the plaintiff's position is if the shot by Officer Horsley was to the back, it completely negates the testimony that they were in a face-to-face combat-style situation because if he was showing his hands, and we think a jury could find he was showing his hands, and we understand this is summary judgment. There's two sides of this case. But the trial court having found that the jury could find that Officer Whitener shot first, that's a trial court finding, they could find that Officer Horsley shot second, and there were many reasons for that, we say that he . . . Does everyone agree on which hand or just that there was something in his hand? The officers assert that as he came down the hall, he was doing something in his waistband, that when his hand came up, there was something black in his right hand. Right. Right. And so it would have been in his right hand. And I wasn't sure. I knew that there was no question of fact that something was in one hand. But is there agreement that it was then in his right hand? Well, the plaintiffs contend that he was showing his hands. Right. The defendants want to claim there was something in his hand. Oh, okay. Tell me what witness said there was nothing in his hands. No, there's no witness that says there was nothing in his hands. We're saying the physical fact . . . So the uncontroverted testimony is that there was something in his hand. But your position is from the facts in the case, we can find that there was nothing in his hand. From the facts in the case, I believe you can find that he stopped, showed his hands, and because the second shot was to the back, it totally negates Officer Horsley's testimony that he shot him in the front as he was aggressing. When you say . . . okay. Well, you were getting ready to do it. When you say to the back, describe how that happened. Our contention is he showed hands. The first shot was Officer Whitener. Grazes the finger. He turns. So he's not in Officer Horsley's face. Their entire theory of justification is he was up in Officer Horsley's face. Just tell me what happened. He turned, shot in the back. That's the deadly . . . that's the shot that killed him. Okay. Show me shot in the back. He was turned around. Facing the other way? Yes. Okay. If the evidence showed that he wasn't facing the other way and that the bullet went into his . . . the side of his back and went down to the front of his right side, would that be consistent with your view of the evidence? Yes, because we agree the shots were quick. Our whole point is those circumstances completely negate the concept that Mr. Hammett was up in the face, as claimed by Officer Horsley, that if he was back here and he was shot and the bullet winds up in the other side of the wall . . . Okay. I'm just trying to . . . I've read the autopsy report several times. He was a relatively short man, about 5'6", and weighed, I think, 241 pounds. And the shot lies 8 centimeters to the left of the midline, and that would be about 3.15 inches. And then it went into the right. It didn't exit the body. It did not exit. It went in downward. Right. And so you can take that description and sort of figure out where the shot went and how he was standing, couldn't you? Well, I think it certainly shows that he was not where Officer Horse was, which is the entire basic . . . or says he was, which is the entire basis of the argument. He was not in that face-to-face . . . I'm just taking the facts in the light most favorable to your position. Correct. Not argument about who said what, you know. But just trying to figure out the facts as you view them. And so I read the . . . frankly, I read the autopsy report trying to . . . because it's a piece of evidence that I think everyone would agree is accurate, and trying to figure out what happened. So it didn't really go into the middle of his back. It went into his side and went to the right front in a downward project . . . in a downward arc. Is that . . . This is a layman's summary of the autopsy report. Okay. Thank you very much. But I think that is consistent with he wasn't in Officer Horsley's face, which is their claim of justification, but he had held up his hand, got shot in the hand, and then turned to retreat. I mean, if I hold up my hand and shoot, I think the jury can say it's a normal reaction to turn to retreat. And then the fact that the shot was to the back, to me, clearly says he was not in Officer Horsley's face. And that's . . . How do you deal with the fact, though, that it's undisputed because the officers are alive and they have said that he actually approached them, kept coming, wouldn't put his hands down, and, in fact, used, I believe, his right hand to do something toward Horsley's face where he and the female officer thought that Horsley was under attack? How do you . . . You don't dispute that. You agree there's no . . . That's undisputed testimony, do you not? It is undisputed testimony, but that does not mean it's undisputed facts because you can look at the testimony, the offer that was behind, as far as who shot in what order and where the bullets entered, and there's physical evidence that a jury could look at and say, they could completely nullify that testimony. Because the officer's testimony itself is conflicting. They don't know who shot first because Rutherford gives a different version than Horsley and Widener. Right. They don't know what was in his hand because at first they said pepper spray. Then they found pepper spray and the son said, that looks like my dad's pepper spray, but nobody is now saying it's pepper spray because that would be inappropriate use of force if that's all he had in his hand. So there seems to be, looking the light most reasonable and favorable to you, the reasonable inferences, there's just some conflicts, is I think the position I'm hearing from you. Is that right? There's irresolvable conflicts, and that's why we believe this case should go to the jury. But you say that you dispute based on where he was standing and where the bullet went at the testimony, but none of that disputes the statement of both officers that he raised his hand and looked like he was taking aggressive action toward Horsley. None of what you've said contradicts that particular piece of testimony. Well, I think you have to look at the three different versions of testimony that Officer Widener gave. She gave four statements. She talked to the GBI. And that's who fired the first shot in that. But do you have anything specific that would call into question the testimony of both officers that it looked as if he was coming at aggressively Officer Horsley with his hand? I think what disputes that as far as Officer Widener is she gave multiple versions of where Officer Horsley was in relationship to Mr. Hammett. So I think the jury can say we don't accept any of that testimony. In the deposition, we asked her to stand up and show where Officer Horsley was when she heard the first shot. And she leans back and says, if I lean back any further, I'll hurt myself. And I think I said, well, don't do that. And she said, well, when he was way back here just about to fall, that's the first pop. That's totally inconsistent with Officer Horsley's testimony, that they were face-to-face. And he says when he shot, there was a glow, and he'll never forget, they were exactly face-to-face. He saw the man's face. He didn't see the man's face. He may have seen his back illuminate, but if he shot the second shot, he absolutely did not see his face. If the jury wants to believe their version, they win. Counsel, I can tell you're a great trial lawyer. And you're making a really, really forceful argument. But I'm just trying to look at the uncontradicted testimony, not the evidence. And I'm trying to figure out what the facts are that would – let me just go through the – I've sort of listed the facts that seem to be uncontroverted. It was very dark inside. All of the windows were taped, and it was at night. The police announced her presence multiple times on executing the search warrant. Daniel approached the officers in the hallway, and Horsley yelled for Daniel to put his hands up. Daniel refused to show his hands but kept them near his waistband in his shirt. Daniel said nothing, moved rapidly towards Horsley, putting up his hands in which he was holding a dark object. And then one shot grazed Daniel's finger, and then the other shot went into his torso and down and lodged into, I think, the upper right quadrant of his stomach. And I understand your theory. I understand your argument. But I would like for you to tell me the facts that support your argument. The facts that support Plaintiff's argument is where the first shot – if the jury believes Officer Watner shot first, and that first shot grazed his finger, which the judge said a jury could find. That is evidence. Well, I don't know if the judge said a jury could find. Didn't the judge say, I'm taking the facts in the light most favorable to the plaintiff? So they assumed that. I don't know if the judge found that necessarily. I believe he said that – didn't the order say that the judge found that a jury could find these facts? Yes. There were nine facts that he said a jury could find. He could find the location of the injury to Mr. Hammond's finger, coupled with the location of the first bullet in the wall, is consistent with Mr. Hammond having raised his hands. I mean, I agree he said that a jury – I'm not – I get from you that the judge found that to be the case. And that a jury could find that. A jury could find something else. But a jury could find – so I'm sorry I interrupted your train of thought. So go ahead. You were answering Judge Black's question. Well, and our point is if she shot first and he was trying to comply, and when he shot, I mean, I think it's normal human reaction. You could either freeze or you could turn. But if that happened, then Officer Horsley's testimony can be completely ignored. And if the judge said that the jury could find that Officer Horsley shot second, then this whole testimony of Officer Horsley saying he was right in my face, I saw his face light up in a glow when I pulled the trigger and thought I had killed him, the jury can disregard that. The jury has the right to do that. All right. Well, I think we have taken you over your time, and so we will add some time to the other side's time. We will give you back four more minutes when you come back for rebuttal. All right. Thank you. Good morning, Your Honors. My name is Terry Williams, and I represent the deputies Horsley and Whitener and Pauldin County. The district court properly granted summary judgment based on qualified immunity because the use of deadly force under the facts and circumstances was objectively reasonable and did not violate the Fourth Amendment. The district court properly held that these officers had an objectively reasonable basis to believe their lives were in peril based upon the undisputed facts that showed that the officers properly identified themselves upon reaching the house, upon entering the house. They announced multiple times that they were law enforcement and they were there for a search warrant. And in the midst of that, as they went through the house, nobody responded, and then Daniel Hammett came out of a bedroom in a darkened hallway and began approaching the officers. It was also undisputed that the officers again announced their presence, and Deputy Horsley in particular said, Sheriff's Office, show me your hands. That's totally undisputed. The plaintiff's wife testified to that, and his son testified that they heard that. In that situation, Daniel Hammett refused to show his hands, refused to comply with the officers' commands. Hands are 52 inches above the ground. What's happening there? He's thrusting his hands. It's undisputed from the officer's testimony. He's thrusting his hands toward Officer Horsley. He has walked down the side, and that's undisputed. Both Whitener and Horsley testified that they saw him approaching. He's refusing to show his hands. He's kind of hugging the side of the hallway, and then suddenly as he gets close to Horsley, comes up with his hands, with the black object in his hands. It's not pepper spray. It turned out to be pepper spray. They did not know at the time it was pepper spray. It's undisputed. No officer ever testified, no, it wasn't pepper spray. They didn't know what it was. They feared it was a gun because it was a black metal object. Concealed by his hands. Sort of concealed by his hands, and remember, it's dark inside the hallway, so they can see dimly. Okay. And in that rapidly developing, dangerous situation, Horsley, when Hammett made that move, he sort of lurched backward to avoid the attack and fired. His testimony is unequivocal that he fired the first shot, and it was in response to that. But they were rapid-fire shots because Deputy Whitener was right beside Horsley and maybe a step back. And so when she testified she saw that happening, she also fired. Although that's not what Officer Rutherford saw. So my question is this. How do you explain the district court's statement in an order granting summary judgment to your client that there may still be questions of material fact? I thought that's exactly what summary judgments were not allowed to venture into credibility determinations. The science here in the light most favorable to the plaintiff is his hands are up, he's shot, he turns to run away, he's shot again. That may not be what happened. But in the light most favorable to Mr. Hammett, the science says that is a reasonable inference. And the judge says there may still be a question of material fact. How then do we get to a grant of summary judgment? First of all, Your Honor, I don't think there is any evidence that he raised his hands in any type of surrender or show me your hands. It's undisputed. The only witnesses to Hammett's actions were the two officers. Because Mr. Hammett unfortunately has passed. That's correct. So in any circumstance. But we still have to look at what's undisputed. And there's no evidence that he raised his hands other than thrusting them toward the officers. So it doesn't matter if they're 52 inches or 58 inches. All that's consistent with a man, 5'6", bringing his hands up. So if there is not another witness other than the police, then there's always going to be undisputed facts. And we don't give any reasonable inference to the science. Well, there's got to be some evidence. I mean, unfortunately he's passed.  The science that his hands were 52 inches, that doesn't disprove any aspect of the deputy's testimony. Uh-huh. And why is it that they can't figure out whose gun shot the fatal? How is that? Well, with Glock 40s, it's very difficult to match up the bullets, is my understanding from having handled these type cases in the past. I don't think that the GBI actually, I don't know if they attempted to do that or not. Because it was pretty much undisputed. Horsley testified and said he shot at his hands because that's what he was reacting to. So it was pretty clear that his shot is the one that hit his finger. Although Rutherford said, I heard a shot. I turned around. I saw a vest. I saw illumination. And then it was Horsley as he went down, suggesting that the first shot came from Officer Whitener. Is that not? That's pure speculation. He's a witness on the scene. You want me to have witnesses on the scene giving you evidence. I'm not saying it's the way it happened, but isn't that a conflict? No, I don't think it is at all. Rutherford testified he heard the first shot as he's looking that direction. First of all, he hears Horsley say, show me your hands, show me your hands. That gets his attention. As he starts to look, he hears the first shot. He sees Horsley because his vest is illuminated by his gun, which they illuminated the lights on their firearms. Then he hears a second shot, and they're both boom, boom. Then Horsley falls. That's perfectly consistent with what Horsley and Whitener said, is he lurched back, fired. Then as the second shot is going, he falls to the ground. There's a difference between falling all the way to the ground and being in the process of falling. So Rutherford's testimony is not inconsistent with the other deputies. It would help to know which gun expelled which bullet. That could help with the sequencing. Yeah, and Rutherford couldn't tell. He said, I don't know. I just heard the shots. He even thought that there may have been more shots, but there ended up being three because Officer Mayfield, who you hear from his counsel, also fired the third shot, we believe was the third shot. Whitener testified that she saw Mr. Hammett, as she's in the process of firing, which takes a little bit of mental process to pull the trigger, saw him twist and believes that her shot hit him in the lower left side of the back as he twisted. There was no real genuine dispute that that is what happened. We believe the shots were fired in that order. But ultimately, as I think one of the judges has already mentioned, it doesn't matter. In that split second, they're both reacting to the attack from Hammett. Who was unarmed. Well, he had a black metal object in his hand that he's thrusting at the officer. A reasonable officer in that situation in those split seconds could believe that that was a weapon. It turned out to be pepper spray. And doesn't your training manual say clearly that if someone is coming at you, an officer, with pepper spray, that does not require, it is inappropriate to use deadly force in that situation. That's correct. If they had known it was only pepper spray, they did not know it was pepper spray at the time. All right. How do you, and I'm sorry, but if I keep going back to the judge's statement, there may still be a question of material fact. What did that mean to you in the order? Just that he's assuming facts in light of the most favorable plaintiff. And there may be other facts that would be in dispute, but he doesn't find that those facts are necessary for him to make the ruling. So we believe that Judge Murphy's decision was very well reasoned and it's based upon the undisputed facts. What the plaintiffs continue to argue is speculation based upon what they contend is some dispute. Like it's speculation as to whether he would have held his hands up. There's no evidence to support that whatsoever. In fact, that is perfectly consistent with him holding up his hands and the rush and thrusting something toward Deputy Horsley. What is your distinction between speculation and a reasonable inference from fact? So he says his argument is, I had my hands up, I turned, I was shot in the back. And Officer Rutherford says, I turned around and this is what I saw. And in both instances you said, well, that's conjecture, that's speculation. What's the difference between that and a reasonable inference from the facts? Well, I mean, it would depend upon the facts. I mean, there's got to be some sort of facts that create a contrary interpretation of what was occurring. Here, as Judge Murphy noted in his order, it's pure speculation to argue that Hammett was in the process of holding up his hands in surrender and was turning and retreating. I mean, that just would be pure speculation based upon what physical evidence was developed and what testimony was developed in the case. All right. And the two reenactments? There was one GBI. They were trying to find out what happened to Officer Mayfield's shot because they could account for two bullets, which they believed was Horsley's and Whitener's. So when they couldn't figure out where that shot went to, they had the officers come back and walk through it to basically try to get the positions of where Mayfield would have been relative to these other officers to find out where it went. What ultimately turned out to be the case is months later, Whitener noticed in her bulletproof vest that there was a defective tear in the bottom of it, and it turned out that they believed that actually Mayfield's shot hit her in the back, and that was the explanation for what had happened to that because they couldn't find a bullet hole anywhere. Did that video, though, was that a reenactment of all the things we've talked about, the twisting and going down the hall? No, they didn't attempt to do that. They didn't put anybody in Hammett's position. They didn't do timing, time frame. It was just let's walk through and get to the positions approximately where the officers were so then we can look and see if we can find a bullet hole somewhere, find this bullet lodged somewhere. Okay. So we believe the district court got this correct in granting the summary judgment, and we would ask the court to affirm. Thank you. Thank you. Thank you. May it please the court, Harvey Gray on behalf of the city of Dallas and one of its police officers, Joe Mayfield. I'm totally extricated from the argument about who shot first. The plaintiff has conceded that Mayfield fired the third shot. The shot did not hit Mr. Hammett. Mr. Hammett could not possibly have been aware of it. It did not terminate his movement in any way. And so from Mayfield's perspective, there's just no Fourth Amendment seizure at all, and there's no case law that we've found anywhere that would suggest that this would be a Fourth Amendment seizure. Secondly, from his perspective, they also have to get over the hurdle as to whether his conduct was objectively reasonable. Now, he's not in the room. He can't see Hammett. He knows that two fellow officers from Paulding County are saying, show your hands. Somebody's obviously approaching. He hears two shots, and then he sees one of his fellow officers fall to the ground. He makes the assumption, a reasonable assumption, turns out to be wrong, that Horsley had been shot. And he fires towards where he perceives the threat to be. But the bullet didn't strike Hammett. So first, there's no Fourth Amendment seizure. And secondly, his actions were objectively reasonable. He also would have qualified immunity. This is certainly a discretionary decision whether to fire a weapon and under what circumstances. So the burden shifts to the plaintiffs to establish that the law was clearly established. And as this Court knows, in the Eleventh Circuit, you only look to Eleventh Circuit precedent, the U.S. Supreme Court precedent, or Georgia Supreme Court precedent. And there is none. There's some discussion of a Sixth Circuit, some Sixth Circuit decisions. I think they support the position that we have advanced. The only case from the Sixth Circuit that said, well, shooting and missing can be a Fourth Amendment seizure if there is a termination of movement, which is what you're trying to effectuate. So they had some fleeing suspect cases that said, well, when they didn't stop and you missed them, that's not a Fourth Amendment seizure. And so that's really what happened here. When they did the briefing on this, because it was based on an undercover buy two days before that. Correct. And the buy happened actually at the front door, but the officers decided to go in the carport. Correct. Was it discussed, was this, well, it was discussed that they didn't think there would be any guns or violence and Mr. Hammett wasn't a target. Was it thought to be a meth lab? Because, of course, you'd be worried about firing a gun in a meth lab. Well, understand that Officer Mayfield was nowhere involved, had no knowledge of, did not participate in the controlled drug buy. No. He was there as part of the drug task force. That's what I wanted to know if it was part of the briefing or anything. I don't think there was, it certainly wasn't developed in the record, I don't think there was any testimony that this was a suspected meth lab. All he knew from his perspective is that these other officers had done a controlled drug buy, had gotten a warrant issued on probable cause. He was not the first in the stack. He didn't make the decision to go into the residence. They went in the residence. He went into the kitchen to clear the kitchen to see if there were any people in there. He remained in the kitchen. He never left the kitchen. He had no line of sight with regard to Mr. Hammett. So he's in the kitchen and he hears, show your hand, show your hand, show your hand, sees some shots and an officer falls to the ground. It may not have been the brightest thing to do to fire through the wall towards a perceived threat, but it's not a Fourth Amendment seizure. And I think he would clearly be entitled to qualified immunity even if the court were to assume, which the court can do either, can assume, can say there's no constitutional violation or say there was, he still would be entitled to qualified immunity because under Ashcroft, every reasonable officer would have to know that their conduct was unlawful. And there's no case like that in this circuit or Supreme Court, Georgia or Federal. Well, the state law claims have obviously been abandoned. The issues framed by the plaintiff in their brief only relate to 1983 claims. It was confirmed by the plaintiffs that they're not pursuing any 1983 claims against the city of Dallas. And they didn't argue that in response to our motion for summary judgment, didn't argue it in this case. However, the judge went on after finding that and said, but even if they did, it wasn't an assault because there was no apprehension by the plaintiff, by Mr. Hammond. And it wasn't a battery because the bullet didn't hit Mr. Hammond. And that even if it did, Georgia law, Selby v. Harrison, says that to overcome official immunity, there has to be actual malice, actual intent to injure that is equivalent to a deliberate intention to do wrong. So I don't believe there's any state law claims. So however the court decides the issue with regard to Mr. Williams' clients and the plaintiffs, we believe that Judge Murphy was eminently correct in granting summary judgment to the appellees that I represent. Thank you. Thank you. Mr. Griffin. Do you want to talk about Officer Mayfield? I would like to talk about the shooting by the two officers with the two bullets that hit Mr. Hammond first, but then I would like to address the question on Officer Mayfield. I believe that Mr. Williams, Judge Black asked the question, give me your best case scenario with the plaintiff. And I believe Mr. Williams may have done a slightly better job of explaining a key aspect than I did on that. When asked the question, he said the testimony of Officer Horsley is the hands were coming toward him, not hand, not just the right hand, but both hands, that the hands are coming toward him and you have to realize Officer Horsley was positioned on the left side, Officer Weitner was back slightly to the right. The jury, if the jury found as the judge said they could find that Officer Weitner shot the first shot, then, I'm sorry, if Officer Horsley is claiming that he shot the first shot, it is highly unlikely, you have to remember, not only did the bullet hit the left index finger, it wound up on the left side, on the opposite side of the wall. So you almost get into the famous John Kennedy magic bullet to think that if the hands were here, it would have shot him, creased the finger, and the bullet wounds up on the left hand wall. So that's just one of many factors, including the ones we discussed in the opening argument, where a jury could say, we don't think this happened this way. We think that the Bay Command. What do you, what do you, I mean, both officers, it's a rapid, if each bullet was almost instantaneous, say who fired first, I don't know, but both officers testified that the firing, immediately after that was because they thought they were under, that Horsley was under attack by your client. And we're talking as if now, in the John Kennedy situation, we can all do those, there's a brooder tape, and we can freeze frame, and uh-oh, I think that's there, no, not that's there. But the case law is clear that in a fast-moving situation, sometimes people will make reactions that later, if you look at the video, you'd say, well, you didn't have to do this, or you didn't have to do that. And don't we have to factor into this that this was a very fast-moving, immediate situation with officers who up to that point had been dealing with a person who had been aggressive, walking toward them, wouldn't stop walking, wouldn't put his hands up. And I don't know, is your theory that just in cold blood, there was nothing wrong, and they just decided we're going to shoot this guy? Is that your theory, that there's nothing, nothing wrong, they just, for whatever reason, decided they were going to shoot this person? No, my theory is that they used unlawful force under the circumstances. Now, that's a legal thing. You think that everything was going, they were not under attack by him, they were not nervous about what he was doing, and they just decided to shoot for no good reason. Is that your position? Your Honor, I mean, that would put a murder standard, which is a totally different standard. I'm just asking if that's your position. What do you, that's what you think factually happened? My position is that Mr. Hammett came out the hall, it's a highly confusing situation, he's hearing police officers, he is not suspected of a crime, he does not have a firearm. That's him. I'm talking about the officer's point of view. Well, as he comes down the hall, I think, if he, if the jury believes that Officer Watner shot first, as he was holding him down. You're talking legal arguments. What are you saying to me you think that the officers did? Why did they do this? I think they overreacted. They panicked. Is that right? The theory would be they panicked. They panicked. I don't remember who shot first. No one can say who shot first. Officer Mayfield shot through a wall because he blindly, as the judge said, got involved in this gunfight. I don't think, and I could be wrong, you're not suggesting, you're just suggesting it went bad, but that there are sufficient material disputed facts for this to move beyond a summary judgment. I think we're in doubt. But you're saying for something to go bad, something usually has to happen. I mean, if you're just standing there and you're hopefully going to put handcuffs on him. Typically, one would think human nature. Before somebody shoots, something's happened to make them shoot, and your position is maybe nothing happened at all. They just shot. They may have thought he was aggressing, but if he stops and shows hands, their job . . . This all happened in a millisecond, you know. Well, they're supposed, they're trained police officers. They're supposed to be able to alert. They're supposed to be decelerating the situation, not accelerating the situation. So, if he stops and shows hands and she shoots . . . I mean, you have to look at all the inconsistency in Officer Whitener's testimony. She goes from . . . I think we know all of that. Well, maybe . . . All of that together. You know, if you try to isolate, it's kind of like that game of Jenga where if you've got the stack, you know, you pull this piece and the whole thing might come down. But you have to build this based on . . . We can't dispute that the two officers . . . All right, I think we have your time, and we've given you some more time. Would you like to conclude at this point? Well, I would like to say, have a short discussion about Officer Mayfield. Well, now, I think we . . . I guess we'll rely on your briefs on that point because I think we have had enough. Why don't you take one minute to tell us about Officer Mayfield? Okay. Well, first of all, there's two cases that plaintiffs and defendants cited in their brief. It's the Cameron and the Floyd case. Those are Sixth Circuit cases. I don't think anybody's found any controlling authority about the seizure question in this circuit. But the Cameron case, even though they said in that case the fleeing suspect jumped over a fence and ran into traffic, well, obviously, that's . . . They didn't seize him if he chose to run out into traffic. But that case even recognizes that if officers are coming in together as a group, shouting commands, which they say they were, taking control of the situation, trying to control, showing their authority. And really, that's what Cameron talks about. If there's a show of authority, which includes gunfire, then it's not limited to those people, those police officers that actually hit the suspect. It's anyone who was participating in that seizure. And that's pretty much what I want to talk about there. I don't think there can be any real serious dispute. Okay. You've had your minute. And I asked you first when you stood up to talk about Officer Mayfield, and you chose to take all your time on the other side. I've given you a minute, and we'll rely on your briefs for the rest of your argument on Mayfield. I'm sorry, Your Honor. We'll rely on your briefs as to Mayfield for the rest of your argument. I've given you a lot of extra time. I appreciate it. All right. We request a reversal. Thank you, Your Honor. Thank you. All right. Call our second case.